[Civ. No. 8977.   Fourth Dist., Div. Two.   May 29, 1969.]

WHITNEY INVESTMENT COMPANY et al., Plaintiffs and Appellants, v. WESTVIEW DEVELOPMENT COMPANY, Defendant and Respondent.

596

Beilenson & Leavy and Alan F. Charles for Plaintiffs and Appellants.

Leland, Hoffman & Kalik and Horace L. Kalik for Defendant and Respondent.

TAMURA, J.—Plaintiffs appeal from an adverse judgment in their action to recover real estate broker's commission allegedly due under an exclusive listing agreement for the sale of certain properties owned by defendant Westview Development Company, a corporation (Westview).

Viewing the evidence in the light most favorable to the party prevailing below, the basic facts may be summarized as follows:

In 1958 plaintiffs as brokers negotiated a contract for the sale to Westview of approximately 350 acres located adjacent to and east of Palm Springs. The contract required Westview to construct an 18-hole championship golf course on the property and to file subdivision maps for residential lots adjacent to the golf course. Westview constructed the golf course which it subsequently leased to the City of Palm Springs and also filed subdivision maps for 120 residential lots. The plan of development for the remainder of the property included construction of residences, apartments, a hotel and the reservation of approximately one-half mile of the acreage fronting on the main highway from Palm Springs to Indio for commercial purposes.

Following completion of the golf course, plaintiffs and

Westview entered into a brokerage agreement which is the subject of the present action. It provided for an exclusive listing with plaintiffs of the entire property, except for the golf course, from June 3, 1959, the date of the agreement, to September 1, 1961, "at prices to be fixed by first party [Westview] and agreed to by Brokers" and provided that commissions would be paid to the brokers "whether said property is sold or leased by said Brokers or by Westview . . . or by another agent. . . ." Under the contract, the brokers obligated themselves to pay monthly rentals ($225) on two existing highway advertising signs then leased by Westview, to operate a tract office located on the premises, to pay $100 a month rental to Westview for the tract office, to pay one-half the cost of bringing electricity to the tract office, to maintain an adequate sales force, and upon Westview's request to expend at least $2,000 for advertising. Brokers agreed to assume the foregoing obligations on August 1, 1959. Westview reserved the right to cancel the agreement on February 1, 1960, "if at least $340,000.00 of properties have not been sold or are not in escrow on that date," and a further right to cancel on May 31, 1960, if on that date 138 houses have not been sold.

Following execution of the listing agreement and on plaintiffs' recommendation, Westview entered into a contract with a Mr. Wald whereby the latter agreed to build 390 homes on the property and to arrange financing for their construction. Wald had plans and specifications prepared but was unable to obtain the financing necessary to proceed with construction.

On July 31, 1959, plaintiffs wrote to defendant stating that although the brokerage agreement provided for the sale of the property at prices to be fixed by Westview, they had not yet been provided with either plans and specifications for the houses to be constructed or prices at which improved or unimproved properties were to be sold and requested that, in the circumstances, performance of their specific obligations under the agreement be deferred until those items have been furnished. Defendant responded by a letter dated August 3, 1959, stating in substance that the delay in the preparation of plans and specifications was not the fault of Westview, and concluded: "However, if you choose to regard our Sales Agreement as inoperative, Westview Development Corporation will do likewise. Therefore, any acreage sold, or sold as a result of negotiations at this time, will certainly not come within the purview of this Sales Agreement. I trust that you

will reconsider your obligations set forth in the Sales Agreement. Please advise.''

Plaintiffs thereafter made efforts to sell the property. Although they failed to comply with the terms of the listing agreement respecting use and occupancy of the tract office or the expenditure of $2,000 for advertising, they paid the monthly rentals on the highway advertising signs through December 1959, constructed and displayed in their realty office window a model of Westview's development, did some promotional work and submitted several offers by prospective purchasers. On November 30, 1959, they submitted to Westview an offer by one prospect to buy the entire property for $1,710,000. On December 5, 1959, Westview responded with an authorization to plaintiff to sell the entire property for $2,000,000, but a sale was never consummated.

On December 9, 1959, Westview sold a group of 55 unimproved residential lots through another broker for $244,750.

Plaintiffs filed the present action on December 29, 1959. On February 1, 1960, Westview gave plaintiffs formal notice of cancellation of the contract pursuant to the provision authorizing cancellation on February 1, 1960, if by that date at least $340,000 worth of property had not been sold or placed in escrow.[1]

The court found in substance that plaintiffs failed to perform their obligations under the contract, that Westview was not obligated to construct improvements on the property, that Westview did set prices for the various parcels of property and that plaintiffs were familiar with them, that Westview did nothing to hinder plaintiffs' performance of the required

---

[1]Insofar as pertinent here, defendant's letter of February 1, 1960, was as follows:

''Without affecting our denial of their validity as set forth as an issue in the declaratory relief portion of your Complaint, we moreover wish to call your attention to the following fact:

''Even if the purported agreements were or are now held valid by any court, they are, by the terms thereof, subject to our right of cancellation of same on February 1, 1960 if at least $340,000.00 of properties have not been sold or are not in escrow on that date.

''This is to advise you that $340,000 of our properties have not been sold, and without prejudicing our rights to deny the validity of the aforesaid purported agreements, we wish to inform you that in any event, our corporation does elect to cancel the aforesaid purported agreements by virtue of the failure of either of us to conclude sales involving $340,-000.00 of our property.

''There are other aspects involving your breach of alleged contract which are not, being set forth here by virtue of the fact that whatever defenses we may raise in connection therewith will be more fully set forth in answer to the Complaint you filed in court against us.''

conditions, that under the listing agreement Westview had the right to sell through another broker, that $340,000 worth of property had not been sold by February 1, 1960. The court concluded that Westview was not indebted to plaintiffs for any commissions and entered judgment for defendant.

## I

Plaintiffs contend that Westview breached the agreement by selling the 55 lots through another broker and thereby became liable to them, as a matter of law, for commissions on that sale. There is no merit in the contention.

While the words "hereby lists . . . exclusively and irrevocably" denote an exclusive agency prohibiting the owner from selling through another agency (*E. A. Strout, Western Realty Agency* v. *Gregoire,* 101 Cal.App.2d 512, 517 [225 P.2d 585]), the provision of the agreement requiring payment of commissions to plaintiffs if a sale is made by another broker, as explained by parol evidence, indicated that the parties intended to reserve to Westview the right to sell through another broker. Mr. Whitney, president of plaintiff Whitney Investment Company, conceded that this was the understanding of the parties.[2]

Thus, the sale through the other broker constituted neither a breach by Westview nor justification for plaintiffs' nonperformance.

## II

Plaintiffs urge that they were excused from using the tract office or expending monies for advertising because Westview failed to set prices for the various parcels as required by the listing agreement. The argument is but an indirect attack upon the court's finding that Westview did fix prices for the properties and that plaintiffs were familiar with them. There

---

[2]Mr. Whitney testified as follows:

"Q Mr. Whitney, in Plaintiff's Exhibit 1, the exclusive listing agreement, sir, were there discussions that are embodied in the agreement between you and the Westview people with regard to sales of the Westview property by other brokers?

"A Yes, there were.

"Q The agreement implies that there may be sales by other brokers?

"A That's right, true.

"Q And there is provision there for commission to you, notwithstanding that fact; is that right?

"A Well, as I remember, why there was a—we were to get fifty percent if an outside broker sold it, and they were to get fifty percent, if I remember right, without reading this.

"Q In any event, it is a fact, that although you had an exclusive, other brokers could sell the property?

"A Oh, yes, yes. We were anxious to cooperate with other brokers."

being substantial evidence to support the finding, the argument must fail.

The record reveals that Mr. Wald testified that definite prices were established both for the houses to be constructed as well as on the unimproved lots and that those prices were discussed with plaintiffs. Mr. Ulman, president of Westview, testified that plaintiffs had assisted Westview in formulating plans for the development of the property and were familiar with the values and prices of the various parcels which would be acceptable to Westview. ■ Needless to say, it is not the function of a reviewing court to reweigh the evidence or to judge the credibility of witnesses. (*Fibreboard Paper Products Corp.* v. *East Bay Union of Machinists,* 227 Cal.App.2d 675, 696-697 [39 Cal.Rptr. 64]; *Overton* v. *Vita-Food Corp.,* 94 Cal.App.2d 367, 370 [210 P.2d 757].)

## III

■ Plaintiffs contend, without supporting authority, that the failure to perform their promises relating to the occupancy of the tract office and expenditures of $2,000 for advertising was, as a matter of law, not a material breach of the contract and, hence, not a valid ground for denial of recovery.

■ Whether a breach is so material as to constitute cause for the injured party to terminate a contract is ordinarily a question for the trier of fact. (*Gold Min. & Water Co.* v. *Swinerton,* 23 Cal.2d 19, 28 [142 P.2d 22]; *Smith* v. *Empire Sanitary Dist.,* 127 Cal.App.2d 63, 73 [273 P.2d 37]; *Meyers* v. *Nolan,* 18 Cal.App.2d 319, 323 [63 P.2d 1216]. ■ The failure of a real estate agent to perform diligently an express or implied covenant of the agency agreement may constitute a material breach justifying revocation of the agency. (*Coleman* v. *Mora,* 263 Cal.App.2d 137, 150-151 [69 Cal.Rptr. 166]; *Fischer* v. *Patterson,* 97 N.H. 318 [86 A.2d 851, 852]; Rest.2d, Agency, §§ 118, 409.)

■ In the present case there was substantial evidence from which the court could have found that plaintiffs' default in the performance of the specific obligations undertaken by them constituted a material breach. Westview had assumed substantial financial obligations under the contract to purchase and in the construction of the golf course. Westview's president testified that the specific obligations imposed upon the brokers were made a part of the listing agreement to assure an immediate and effective sales campaign in order to

enable Westview to meet its financial commitments. In these circumstances, plaintiffs' failure from the outset to perform certain of the specific promises could have been found to be a material breach and ground for termination of the contract. ■ The timing of a breach is a relevant consideration in determining its materiality; a slight breach at the outset may justify termination whereas a like breach later in performance may be deemed insubstantial. (*Associated Lathing etc. Co.* v. *Louis C. Dunn, Inc.*, 135 Cal.App.2d 40, 49-50 [286 P.2d 825] ; Rest., Contracts, § 276(c).)

## IV

■ Finally plaintiffs contend that despite their failure to perform all of their promises, the parties continued to treat the contract as being alive and that it was not terminated until Westview gave formal notice on February 1, 1960. If plaintiffs' contention in this respect is valid, the agreement would have been effective when Westview sold 55 lots through another broker on December 9, 1959, and, under the terms of the agreement, plaintiffs would have been entitled to a commission on that sale.

While the court found that plaintiffs failed to perform all of their promises, it did not find that Westview terminated the contract by reason of such partial breach. It is our conclusion that the failure to make such finding requires reversal.

■ A breach does not terminate a contract as a matter of course but is a ground for termination at the option of the injured party. (Civ. Code, §§ 1689 and 1691; *B. L. Metcalf General Contractor, Inc.* v. *Earl Erne, Inc.*, 212 Cal.App.2d 689, 693 [28 Cal.Rptr. 382] ; *Ely* v. *Bottini*, 179 Cal.App.2d 287, 296 [3 Cal.Rptr. 756] ; 1 Witkin, Summary of Cal. Law (1960) p. 296; see *Coleman* v. *Mora, supra,* 263 Cal.App.2d 137, 149.) ■ Thus a finding of termination is not one which must be implied from a finding of a breach. (See *Fischer* v. *Patterson, supra,* 97 N.H. 318 [86 A.2d 851, 852-853].)

Westview suggests that its letter of August 3, 1959, in response to plaintiffs' letter of July 29, 1959, requesting deferment of the August 1, 1959, commencement date of their obligations constituted notice of election to terminate the contract. A finding of anticipatory breach could not have been predicated on plaintiffs' letter. ■ In order to constitute an anticipatory breach the promisor must manifest such intention by a clear, positive and unequivocal refusal to perform.

(*Guerrieri* v. *Severeini,* 51 Cal.2d 12, 18 [330 P.2d 635]; *Gold Min. & Water Co.* v. *Swinerton, supra,* 23 Cal.2d 19, 29; *Hertz Driv-Ur-Self Stations, Inc.* v. *Schenley Distilleries Corp.,* 119 Cal.App.2d 754, 760 [260 P.2d 93]; Rest., Contracts, § 318(a).) ▮ Plaintiffs' letter was neither a repudiation of the contract nor a refusal to perform. The concluding paragraph read: "We fully realize the deadlines imposed on the first page of our agreement and are accordingly as anxious as you to get to work. Let us get together to discuss and agree on a workable schedule for all of the aforementioned points."

While Mr. Ulman, president of Westview, testified that following the exchange of letters he had an informal conversation with Mr. Franks, one of plaintiffs' brokers, in which he told Franks ". . . in my opinion they have not lived up to their obligations on the contract, and we were considering that we no longer had a contract. However, I did not shut the door on him. If he brought a buyer for a piece of land he would be treated like any other real estate salesman or broker that bought land from me," it would be sheer speculation to conclude that the trial court would have found on such evidence that Westview thereby elected to terminate the contract. ▮ While a notice of termination or cancellation of a contract for breach need not be formal and explicit, it should clearly indicate to the defaulting party that the injured party considers the contract terminated. (See *Landry* v. *Marshall,* 243 Cal.App.2d 170, 177 [52 Cal.Rptr. 119].)

▮ Moreover, although the evidence disclosed a partial breach by plaintiffs, there was evidence from which the court could have found that Westview waived the breach. Plaintiffs continued to pay $225 per month rental on the highway advertising signs through the month of December 1959 as required by the listing agreement; they constructed and displayed in their office window a large model of defendant's proposed development; they obtained and transmitted several offers to Westview; and they continued to negotiate for the sale of the property to prospective buyers until December 1959. ▮ When the injured party with knowledge of the breach continues to accept performance from the guilty party, such conduct may constitute a waiver of the breach. (*Kern Sunset Oil Co.* v. *Good Roads Oil Co.,* 214 Cal. 435, 440 [6 P.2d 71, 80 A.L.R. 453]; *Leiter* v. *Eltinge,* 246 Cal.App.2d 306, 317-318 [54 Cal.Rptr. 703].)

▮ In view of the foregoing evidence, the question whether Westview terminated the contract and, if it did,

when such termination occurred, were material issues which should have been resolved by specific findings. (*Fischer* v. *Patterson, supra,* 97 N.H. 318 [86 A.2d 851] ; see *Gaddis Inv. Co.* v. *Morrison,* 3 Utah 2d 43 [278 P.2d 284].) ■ A judgment rendered without findings on all material issues must be reversed. (*Anderson* v. *Southern Pac. Co.,* 264 Cal. App.2d 230, 234 [70 Cal.Rptr. 389] ; *Calloway* v. *Downie,* 195 Cal.App.2d 348, 352 [15 Cal.Rptr. 747] ; *Estate of McAfee,* 182 Cal.App.2d 533, 556 [6 Cal.Rptr. 79].)

■ While the general rule is that findings phrased in general language, if otherwise sufficient, imply the finding of every fact essential to support the judgment, that rule is inoperative where requests for special findings have been made. (*Anderson* v. *Southern Pac. Co., supra; Culbertson* v. *Cizek,* 225 Cal.App.2d 451, 465 [37 Cal.Rptr. 548].) ■ Plaintiffs filed special objections and requests for special findings including the following : "Defendant is indebted (or is not indebted) to plaintiffs for commissions, in the amounts specified in the agreement, for sale of defendant's real property made during the period when the agreement was in force and effect, or during the period when plaintiffs and defendant treated the agreement as being in force and effect." The quoted request may be fairly construed as a request for a specific finding on the question whether the contract had been terminated prior to the sale of the 55 lots through another broker. It was a request for a finding on a crucial issue and one which the court was not at liberty to disregard. (*Hemmerling* v. *Tomlev, Inc.,* 67 Cal.2d 572, 576 [63 Cal.Rptr. 1, 432 P.2d 697] ; *Culbertson* v. *Cizek, supra,* 225 Cal.App.2d 451, 466.) ■ The purpose of section 634 of the Code of Civil Procedure providing for objections and requests for special findings is to discourage general findings which "left counsel and the appellate court unable to determine the trial court's resolution of the conflicting facts needed for a factual determination of the case." (*Garber* v. *City of Los Angeles,* 226 Cal.App.2d 349, 355 [38 Cal.Rptr. 157].) The section was designed to assure adequate and proper review of trial court decisions. (*Fairbairn* v. *Fairbairn,* 194 Cal.App.2d 501, 514 [15 Cal.Rptr. 548].) ■ The findings in the instant case do not provide sufficient guidance to enable a reviewing court to determine how the trial court resolved material issues in the case.

Judgment is reversed.

Kerrigan, Acting P. J., and Gabbert, J. pro tem.,* concurred.

A petition for a rehearing was denied June 17, 1969.

*Assigned by the Chairman of the Judicial Council.